12826

McLANE v. METROPOLITAN LIFE INS. CO.

(151 S. E., 608)

*Messrs. Elliott, McLain, Wardlaw & Elliott,* for appellant,

*Messrs. James H. Hammond,* and *James S. Verner,* for respondent,

February 5, 1930.

The opinion of the Court was delivered by Mr. Justice Blease.

This was an action upon two policies of life insurance issued by the appellant on the life of Janie B. McLane, the

beneficiary being the respondent, the husband of the insured. The appellant admitted the issuance of the policies, and defended on the ground that they were obtained by the fraud of the insured, participated in by the beneficiary. The trial in the County Court of Richland County resulted in a verdict for the respondent for the full amount claimed.

It is entirely unnecessary to review and state the facts developed by the evidence of the parties, for the appellant does not question that it was proper for the Court to submit the issues involved to the jury for settlement.

The appeal to this Court raises two questions, the first relating to an instruction given by the County Judge to the jury, and the second to certain remarks of an attorney for the respondent in his address to the jury.

The appellant contends that it was error for the Judge to use in his charge this language:

"Now on this proposition of waiver, the law says that if the insured is examined by a physician for the company, that examination is evidence of one of two things; either that the disease did not exist, or that its existence was known about and waived by the insurer."

In connection with its exception challenging the correctness of the instruction, the appellant has asked, and obtained the leave of the Court for a review of the case of *Wingo v. New York Life Insurance Company*, decided August 25, 1919, reported in 101 Southeastern Reporter at page 653. (This case seems not to have been reported in the South Carolina Reporter. We are unable to find it, and the attorneys in this case have not found it. Since it is a case of some importance, it should be even yet reported. The error in failing to report it may have occurred from the fact that the case came to this Court on two occasions. The first appeal is in 112 S. C., 139, 99 S. E., 436.)*

The appellant states that "the *Wingo case* has been understood to hold, and cited to hold, as illustrated by Judge

---

*This case, overlooked by a former Reporter, will be found in 155 S. C. Reporter.

Whaley's charge" in this case, "that if the applicant for insurance has been examined by the company's physician, the company cannot prove fraud by the applicant in procuring the policy, since the examination by the physician is conclusive (1) that the disease did not exist, or (2) that it was waived by the company." The appellant, as we understand it, takes the position that the *Wingo case* did not go as far as indicated; but, if it did, then it should be overruled. Say the counsel for the appellant in their argument:

"If Judge Whaley in this case, now on appeal, had charged the jury as fully and completely as did Judge Mauldin (who presided in the *Wingo case*), his charge would have been correct with the *Wingo case* as authority for the instructions, but by restricting his charge to the narrowed proposition, that examination by a company physician is evidence of *one of two things,* either that the disease did not exist, or that its existence was known about and waived by the insurer without telling the jury that if the physician made a reasonable examination and failed to discover the disease, and such failure was due to the fraud of the applicant, then the plaintiff could not recover, he made reversible error which entitles the applicant (appellant?) to a new trial in order that due consideration may be given by the jury to these important facts in the case."

After all, the contention of the appellant seems to us to be that the instructions given to the jury by the presiding Judge in the *Wingo case* (second appeal) were correct declarations of the law, and that the charge in this case, complained of, is not in harmony therewith, for the reason that more language, explanatory of what was said, was not used. What the appellant really asks is a strict application of the doctrine of the *Wingo case.*

We agree with the appellant in its proposition to the effect that this Court did not say, and did not intend to say, in the *Wingo case,* that the examination of an applicant for insurance, who is afterward accepted by a physician selected

by the insurer, is *conclusive evidence* of one of two things, either (1) that a disease, which would have prevented the policy from being issued, did not exist, or (2) that its existence was known and waived by the insurer. It is our opinion that the Court only intended to say—and in fact it said—that such examination, preceding the acceptance of the applicant, is *some evidence* of one or the other of the two things mentioned, and such evidence is sufficient to carry the case to the jury on the question of waiver, when the insurer pleads fraud in the obtaining of the contract of insurance, based on the concealment from the insurer of some disease in the insured, the knowledge of which if communicated to the insurer would have caused the insurer to decline to enter into the contract. Our understanding of the law, as here announced, we conceive to be entirely harmonious with the principles declared in the *Wingo case.* And so understood, we approve the holdings there made.

In the *Wingo case,* the instructions given by Judge Mauldin contained the same principle announced by Judge Whaley in the charge which the appellant here claims to have been erroneous. In connection with the word "evidence," and preceding that word, Judge Mauldin used the word *"some."* In reply to inquiry made of Mr. Wardlaw, appellant's counsel, who argued, ably and interestingly, the case at the bar of this Court, we ascertained that the appellant did not complain of the failure of the presiding Judge in this cause to use the word "some." While the matter is rather technical, we are inclined to think that it would have been better if the expression "some evidence" had been used.

It is to be noted that in giving the instruction the Judge did not use the word "conclusive" in speaking of the effect of the evidence as to the examination by the company's physician. If the Judge had told the jurors that the examination of the physician was *conclusive evidence* of either one or the other of the two things referred to by him, the effect would have been altogether different, and very likely the appellant would have just cause to make complaint.

In addition to the legal principle adverted to, announced by Judge Mauldin in his instructions in the *Wingo case,* he did go further in that connection in explaining to the jury the full effect of the proposition of law which he there announced. He added an instruction to the effect that, if the physician's failure to discover a disease of the insured was due to the fraud of the applicant, then the plaintiff could not recover.

So conceding, as we must under the authority of .the *Wingo case,* that the proposition of law given to the jury by the trial Judge in this case was absolutely correct, the whole matter to be disposed of by the appellant's exception revolves around the failure of the presiding Judge to go more at length in the instructions he gave. In other words, was the failure to charge more fully at that particular time, and in connection with the charge given, reversible error?

Under our view, we are forced to answer the question stated in the negative. An examination of the entire charge, including the requests submitted by the appellant, which were charged, convinces us that the presiding Judge fully covered the law as to appellant's defense of fraud and the respondent's claim of waiver, and these instructions contained correct legal principles. The jury were told in the general charge that, if the appellant established by the preponderance of the evidence its defense of fraud, the verdict should be in favor of the appellant. In the requests submitted by the appellant, this phase of the law was sufficiently covered. We direct particular attention to this language in the charge:

"That if you find from the evidence in this case that the answers made by the wife of the plaintiff in the application were false and material to the risk incurred by the insurer, and were made with intent to deceive the company, and the company relied on them to its injury, then you would have to find for the defendant unless waiver was shown by the plaintiff."

The main difference between the charge of Judge Whaley in this case and the charge of Judge Mauldin in the *Wingo case* is that Judge Whaley charged the jury the last language we have quoted prior to the instruction which the appellant challenges, while in the *Wingo case* Judge Mauldin charged as to fraud on the part of the insured immediately following his instructions as to the examination made by the company's physician. It was not incumbent upon the trial Judge in this case to use the identical language used by Judge Mauldin, or to follow the former's manner of charging a jury. As Judge Whaley well told the jury, he could not "give the law in one breath." The charge of a trial Judge must, of course, be considered as a whole. We cannot take an isolated excerpt from a charge and decide that it was erroneous, without considering the bearing upon it of other language in the charge. *Crawford v. Davis,* 136 S. C., 95, 134 S. E., 247; *Nettles v. Nettles,* 138 S. C., 318, 136 S. E., 297. Many, many other cases sustain this principle. This wholesome doctrine should not be interfered with in the slightest for to do so would but bring disorder in the administration of justice.

The language of Mr. Hammond, one of the attorneys for the respondent, in his argument to the jury, of which the appellant complains, was as follows:

"I think in the name of insurance and fair dealing in South Carolina today, especially in Richland County, that it would be a sad time when a man comes into Court having paid his premiums for his policy, having had what is called a sacred contract, and it falls down on him. As I was saying when they broke me off awhile ago, that if this case is decided for the defendant, every policy in South Carolina will be weakened in its validity."

In response to objection on the part of appellant's attorney to the use of that language, the County Judge ruled, in effect, that he could not stop counsel from "drawing certain inferences" from the evidence in the case.

Attorneys in making arguments to juries should, of course, try always to confine themselves to the evidence adduced in the trial. It is very difficult, as heretofore repeatedly held by this Court, to draw the line between proper and improper argument. We must leave the control of the arguments of counsel very much to the discretion of the trial Judge, who is on the scene of action and in much better position than we are to judge as to what is improper argument. While the language of respondent's counsel was pretty strong, we are not prepared to say that the County Judge committed an abuse of the discretion allowed him because of his refusal to reprimand the attorney for making the statements. It is not to be overlooked that the appellant in this case made the very grave and serious charge against the respondent, who was the client of the attorney, that he had been guilty of a most reprehensible fraud in procuring insurance on the life of his dying wife for the purpose of obtaining money from the appellant. More than that, the appellant even charged the dead wife of the respondent, who was not there to speak for herself, of participating in the respondent's fraudulent scheme. In making charges of this character, the appellant and its counsel should have expected the respondent and his counsel not to be in the best of humor. Charges of gross misconduct against a good lawyer's client may be expected to bring forth from that lawyer some vigorous language. Under these circumstances, the language used by the respondent's attorney may not have been altogether out of place. And, certainly, the judgment below should not be reversed on that ground.

The judgment of this Court is that the judgment of the lower Court be, and the same is hereby, affirmed.

MR. CHIEF JUSTICE WATTS and MR. JUSTICE STABLER concur.

MR. JUSTICE CARTER concurs in result.

MR. JUSTICE COTHRAN (dissenting) : This is an action upon two policies of insurance issued by the defendant

company upon the life of Janie B. McLane, July 20, 1927, in the sum of $1,000 each, payable in the event of her death to her husband, the plaintiff, Henry J. McLane. The insured died of cancer on June 16, 1928, and, upon refusal of the company to pay, suit was instituted on September 14, 1928, by the beneficiary.

The defendant answered admitting the issuance of the policies, and alleging that they were obtained by the fraud of the insured in knowingly misrepresenting the condition of her health by making false answers to material questions, which were contained in the application; and that the beneficiary, the plaintiff, participated in the fraud.

The action came on for trial before his Honor, Judge M. S. Whaley, and a jury on January 7, 1929, resulting in a verdict for the respondent for the amount of each policy, to wit, the total sum of $2,000, with interest from June 18, 1928.

Among the many quaint expressions and epigrams of the late Justice Gage, an honored member of this Court, is this: "The facts breed the law." It is impossible to get away from them in stating and applying the principles of the law; in the case at bar they are substantially as follows (although there were two policies issued, identical in all respects, it will be more convenient to refer to them as one):

On July 11, 1927, the insured signed an application for the insurance; it consisted of two parts, A and B.

Part A contained this stipulation:

"It is understood and agreed:

"1. That the foregoing statements and answers are correct and wholly true, and, together with the answers to questions on part B hereof, they shall form the basis of the contract of insurance, if one be issued. * * *"

And part B:

"I hereby certify that I have read the answers to the questions in part A hereof and to the questions in part B hereof, before signing, and that they have been correctly

written, as given by me, and that they are full, true and complete, and that there are no exceptions to any such answers other than as stated herein."

The policy contained this provision:

"This policy and the application therefor constitute the entire contract between the parties, and all statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties, and no statement shall avoid this policy or be used in defense of a claim hereunder unless it be contained in the application therefor and a copy of such application is attached to this policy when issued."

The defendant contends that the answers given by the insured to certain questions propounded by the medical examiner of the company, written down by him, as parts of part B of the application, and signed by the insured, were with regard to matters material to the risk of insurance; that they were knowingly false and fraudulent, and made for the purpose of deceiving the defendant and inducing it to issue the policy; that the specific questions, with the answers given by the insured, are set out below with the grounds of alleged falsity:

"Q. Present condition of health? A. Good"; whereas the applicant was then being treated by two physicians for *cancer!*

"Q. When last sick? A. Month July, year 1926"; whereas the insured was then suffering with said disease. .

"Q. Have you had any surgical operation, serious illness or accident? If yes, give date, duration and name of ailment? A. No"; whereas she was then knowingly being treated for cancer.

"Q. Have you ever had any of the following complaints or diseases * * * cancer? * * * If yes, give particulars, dates and duration? A. No".; whereas she then had cancer and was receiving treatment therefor.

"Q. Have you been attended by a physician during the last five years? If yes, give name of complaints, dates, how long sick and names of physicians. A. Dr. McElroy, 3 years ago, miscarriage"; whereas she was then undergoing treatment for cancer which caused her death. She was being attended by two physicians other than Dr. McElroy.

Dr. Able testified that as medical examiner for the company he examined the insured in this action and recorded the answers to the questions asked by him as shown by part B of the application; that he did not make a vaginal examination of the insured, and would not make one without a suggestive personal history given by the applicant; that he would not suspect a local uterine condition to be present in the applicant for insurance in this case upon an examination ordinarily made by him in accordance with his instructions and understanding of appellant's requirements, without a suggestive personal history; that a vaginal examination of an applicant is never made unless a suggestive history is given, for the reason that applicants would not stand for it; that there are questions contained in the application which, if truthfully answered, would suggest the possibility of a diseased uterine condition; that there was nothing contained in the application or in the answers to questions asked the insured to indicate that she had been a sick woman for a year or more.

Dr. Welbourne (a lady) testified that she specialized with women, children, and obstetrics; that she first treated the insured May 16, 1922, for pregnancy; that beginning August 30, 1926, and ending April 22, 1927, she treated the insured for ulcerated condition of the cervix (the cervix is the part of the womb that protrudes into the vagina), for pyelitis (inflammation of the pelvis—of the kidney), and cystitis (inflammation of the lining of the bladder); that the insured made the following visits to her for treatment in the year 1926: In August, 2; September, 20; October, 8; November, 12; December, 11. In the year 1927:

January, 11; February, 9; March, 8; April, 5—a total of 86 visits covering a period of nine months; that during the period covered by these visits the insured did not have the appearance of a sick person, could attend to her customary duties, and without an examination her diseased condition could not be ascertained or suspected; that she did not tell insured she had cancer, but discussed the trouble with her; that she suggested to insured an exploratory operation to see if her condition had advanced beyond the cervix, and insured decided to have Dr. Benet make the operation.

Dr. Rodgers testified that he was called to examine and treat insured with radium; that insured had a malignant type of cancer, a practically hopeless case; that he saw and treated insured first on May 2, 1927 (the application for insurance was dated July 11, 1927); that he gave her five radium treatments from May 2, 1927, to October 12, 1927; that up to the date of application for insurance he had given insured four doses of radium; that he also gave her x-ray treatment, the last being given on December 9, 1927; that at the time of his first examination on May 2, 1927, the cervix of insured was very large, about the size of an orange; there was a large crater in the center which bled easily, and which had a characteristic odor (diagnosis, carcinoma); that without a physical examination of the uterus or suggestive personal history, and judging alone from personal appearance, he would not be informed or suspect the diseased condition of insured; that he did not inform insured that she had cancer, but did inform her husband, the respondent in this action.

Dr. Speer testified that the insurance company depends absolutely upon the statements made by the applicant to the examining physician; that, if the applicant had stated, in answer to questions of the examining physician, that insured had received the medical treatment as testified by Drs. Welbourne and Rodgers, no policy would have been issued;

that, unless a suggestive personal history is given by the applicant, it is not the practice, and none of the medical examiners of the insurance company make an internal examination of women.

Boliver, the agent who solicited the insurance, testified that he had been soliciting respondent for insurance commencing about 1923; that on July 11, 1927, when respondent authorized him to take the application of his wife for insurance, respondent told him his wife was "ailing," and he had better not take the application, to which witness replied, "well, it doesn't make any difference about that part of it." "I don't pass on that." "Our doctor passes on that." "I am not a medical man and I have nothing to do with that part of it." "You go ahead and let me write the policy and let us be the judge of that"; that he saw the insured, and she looked healthy to him; that respondent did *not* tell him his wife had cancer. The respondent testified that he told Boliver that the doctors had told him his wife had cancer. The testimony was corroborated by R. C. Sharpe, a witness for respondent, who testified that he heard respondent tell Boliver that his wife was under treatment by a doctor; that he thought she had a cancer. Boliver denied that Sharpe was present when he talked with respondent.

There is no question, in fact it is so admitted by the beneficiary of the policy, that he had been informed of the malady from which his wife was suffering; he claims to have communicated that information to the soliciting agent.

The company bases its appeal upon two grounds: (1) That his Honor erred in giving the following charge to the jury: "The law says that if the insured is examined by a physician for the company that examination is evidence of one or two things; either that the disease did not exist or that its existence is known about and waived by the insurer." (2) Certain alleged prejudicial remarks of counsel for the plaintiff in his address to the jury.

The last I will pass over, being satisfied with the disposition of it by Mr. Justice Blease, and will address myself to a consideration of the first ground.

The charge is practically a reproduction of a declaration made by the Court in the case of *Gamble v. Insurance Company*, 95 S. C., 196, 78 S. E., 875, 876, with the exception that in the latter the expression is *some evidence,* thus:

"We cannot say that there was no evidence (of waiver, I interpolate). An examination of the deceased (insured?), by a physician chosen by the insurer is *some evidence* of one of two things, either that the disease did not exist, or that its existence was known to and waived by the insurer."

Counsel for the company has received permission of the Court to review the case of *Wingo v. Ins. Co.,* reported in 101 S. E., 653 (inadvertently omitted in the official volumes of the reports), which is based upon the above-quoted declaration of the Court in the *Gamble case.*

As I understand the opinion of Mr. Justice Blease, and I do not mean to intimate that it is in the least degree obscure, the *context,* as the preachers say, of the charge of his Honor, Judge Whaley, assimilates it to the charge of his Honor, Judge Mauldin, in the *Wingo case,* which announces the principle which the learned justice approves, as follows:

"I charge you that an examination of the deceased by a physician chosen by the insurance company is *some* evidence of one or two things, either that the disease did not exist, or that its existence was known and waived by the insurance company. If you find from the facts in this case that the disease did not exist, or that its existence was known to the physician, *or by reasonable examination on his part could have been known,* he will be held in law to have known of the disease, and the company will be deemed to have waived it, and your verdict should be for the plaintiff. And I add here: 'But if the physician did make a reasonable examination and failed to discover such disease, and such failure

was due to the fraud of the applicant, as I have defined fraud to you, then the plaintiff could not recover.'"

Assuming that the "context" of the charge of his Honor, Judge Whaley, cured, what otherwise may have been reversible error (without intending to subscribe to that hypothesis), I think that the doctrine announced in the *Wingo case,* sustaining the charge of his Honor, Judge Mauldin, is demonstrably unsound.

It therefore appears to me logical to first address my observations to the declaration of the Court in the *Gamble case,* the bellwether of the flock, and then to the *Wingo case;* it and others have apparently leaped the bars, following the lead of a bad example.

I do not apprehend how it can possibly be true that *the simple act of an examination* of the insured by a physician selected by the company, without the statement of any circumstance connected with the examination, may warrant an inference that the insured did not have a disqualifying disease. So much depends upon the thoroughness of the examination, the intelligence and expertness of the physician, and the nature and location of later developed or discovered disease. Suppose, for instance, the insured were affected with the dread disease upon an exposed part of his person, and should be examined by a physician familiar with that disease, his failure to discover it would be *some* evidence that at the time of the examination the disease was not present; it would not have been an unnatural inference that, if the disease existed at that time, the physician would have discovered it, and under these circumstances the inference would have been for the jury. In the case at bar, there is no doubt that, at the time of the examination, the insured had the disease. The physician who examined her in May prior to her application in July testified that at the time of his first examination, two months before the application, the cervix of insured was very large, *about the size of an orange;* that there was a large "crater" in the center, "a

dug out ragged edge affair," which emitted the characteristic odor of cancer, and that it had existed for a year previously thereto; that her condition would not be discovered by an ordinary examination "without a suggestive personal history given by the patient"; that he informed the husband of the fact that his wife had a cancer, and "probably would not live." The circumstances were such that, in the absence of any suggestion of cancer in such part of her body, and in view of her positive statement that she had never had the disease, it is highly improbable that the physician would or should have undertaken such a delicate and embarrassing exploration.

The declaration, therefore, without the qualifications above referred to, was clearly erroneous.

The declaration was prejudicial, for the further reason that there was no doubt that the cancer was present, and it presented to the jury the opportunity of finding from a technical inference *that that which was admitted to have existed at the time of the application did not exist.* This inference falls to the ground upon its appearing, concededly on all sides, that the disease did exist, and was known to exist by the husband, the beneficiary of the policy.

It is of interest to note that in the first appeal of the *Gamble case,* 92 S. C., 451, 75 S. E., 788, 41 L. R. A. (N. S.), 1199, under facts quite similar to those in the case at bar, the Court in very strong terms held that a husband who was instrumental in procuring insurance upon the life of his wife, who he knew had an incurable disease, was estopped from collecting the insurance, as beneficiary of the policy, upon her death.

Considering the alternative inference declared possible from the fact of the examination of the insured by a physician chosen by the company insurer, that the existence of the disease was known to and waived by the insurer: It strikes me as a most remarkable conclusion that the same

single act of examination, with absolutely no explanatory circumstances, should, at the option of the plaintiff, produce one or the other of two antipodal inferences: that the disease did not exist or that it did; that, if it existed, its existence was known to the company (whether to the physician or not makes no difference), and that the company waived its existence; an inference upon an inference, piling Ossa upon Pelion.

The proposition necessarily implies that from the simple fact of examination, regardless of the circumstances under which it was made, the inference is justifiable that the physician knew of the existence of the disease, and from that inference that a further inference is justifiable that the company waived its existence. The possible inference that the physician knew of the existence of the disease could only arise, as I have endeavored to show in discussing the first alternative, by the evidence of the circumstances attending the examination, the skill of the physician, the thoroughness of the examination, and the nature and location of the disease. I think, therefore, that the declaration as affecting either alternative is too broadly stated, and lacked the essential elements referred to of legitimate inference.

I direct attention to the fact that the *Gamble case* was heard by the Court, consisting of Chief Justice Gary, and Justices Hydrick and Fraser (Justice Watts being disqualified, and Justice Woods having resigned). The opinion in which the declaration under review appears was written by Justice Fraser. Justice Hydrick dissented, and the Chief Justice filed a concurring opinion in which he said that *"the question of waiver was not involved in the case.  *  *  *"* So that at best the declaration can be considered as the individual opinion of Justice Fraser, carrying such weight only as his long, faithful and conscientious service entitles it to.

I come next to a consideration of the *Wingo case,* 101 S. E., 653, largely based upon the *isolated declaration* in the *Gamble case.*

So much of it as practically reproduces that declaration is subject necessarily to the criticism of it hereinbefore indulged in. In addition to this criticism, I think that there is a glaring error in the charge of his Honor, Judge Mauldin, in the *Wingo case,* which justifies the request of counsel that that case be reviewed, and militates against the unqualified indorsement of that charge contained in the.opinion of Mr. Justice Blease in the case at bar.

In substance, the proposition is advanced that, if a medical examiner for the company, by making a reasonable examination of an applicant for insurance, could have discovered the existence of a qualifying disease, his failure to do so, regardless of whether it was superinduced by the fraud of the applicant or not, will be imputed to him as knowledge of its existence, and will be deemed a waiver of it by the company. The very correct proposition was advanced that, if the failure of the physician to discover the disease was due to the fraud of the applicant, the plaintiff could not recover; but, in the portion of the charge now under.consideration, a very different proposition is advanced, namely, that if the physician was negligent in not discovering the disease, *even if that negligence was not induced by fraud of the applicant,* the physician nevertheless will be charged with knowledge; that his implied knowledge will be imputed to the company, and will constitute a waiver upon the part of the company. In other words, that the beneficiary will be insulated from the willful misrepresentations of the insured by the *neglect* of the physician in not exercising reasonable care to ascertain the falsity of such misrepresentations. I do not think that that is the law.

I think that the isolated declaration in the *Gamble case,* the charge in the *Wingo case,* and the charge in the case at bar are all erroneous, for another reason: The question of waiver, like that of negligence, is a mixed question of law and fact; it is the province of the presiding Judge to define waiver, which he may do in the stereotyped form, "the

voluntary relinquishment of a known right," and it is his duty to submit to the jury the issue whether, from the facts established to their satisfaction, *waiver ought to be inferred.* He is not authorized upon an issue of negligence to charge that certain facts constitute negligence, and the same rule, as I understand it, obtains upon the issue of waiver.

It is true that the charge was that the medical examination *was evidence* of one or the other of the two things mentioned; but it would be attributing to the average jury a more refining faculty than usual, the discrimination between *evidence* and *proof;* the expression might easily have been, and probably was taken as synonymous with the last. But, even if it can be confidently asserted that this discrimination was indulged in, I do not think that he was authorized to say that the medical examination was evidence of the material issue for the jury's decision, any more than a Judge should tell the jury that the failure to station a flagman at a crossing was evidence of negligence. The only instance where such a charge is permissible is where the alleged duty is imposed by statute, when a failure to exercise it may be designated as negligence *per se,* legal negligence.

For the familiar rule as to negligence see *Pickens v. R. Co.,* 54 S. C., 498, at page 509, 32 S. E., 567.

In the case of *Norris v. Clinkscales,* 47 S. C., 488, 25 S. E., 797, it is declared that the presiding Judge may not either state the testimony or comment upon the legal effect of it. As far as the Court has gone is *Norris v. Ins. Co.,* 57 S. C., 358, 35 S. E., 572, 576, which gives a guide in cases of waiver by insurance companies. There it is said (approving a charge) :

"When an insurance company, with knowledge of the forfeiture of a policy, sends an agent to adjust the loss, or does any other act which recognizes the validity of the policy, *it is evidence which the jury may consider in determining whether there was intention on the part of the company to*

*waive forfeiture."* The charge in the present case went much further than this, stating to the jury the effect of the testimony.

It appears to me to be conceded in the opinion of Mr. Justice Blease that, unless the old slogan of considering the charge as a whole, which has done yeoman service in many an instance of admitted error, can be successfully invoked in the present controversy, the error is irremediable. I do not think that there is the least bit of saving grace in the charge as a whole.

The declaration of the presiding Judge is simple and unqualified:

"The law says that if the insured is examined by a physician for the company that examination is evidence of one or two things; either that the disease did not exist or that its existence is known about and waived by the insurer."

It is conceded that it would have been better to say, as his Honor, Judge Mauldin, charged in the *Wingo case,* that it was *some* evidence; but it is urged that the omission was cured by other parts of the charge. I do not find such curative balm in the charge. His Honor charged fully and fairly upon the question of fraudulent concealment and representations, but not at all in connection with the issue of waiver. When he comes to that issue, he lays down the law simply and clearly, but, as I think, mistakenly, by reason of the absence of qualifications.

I am aware of no provision in the policy, in law, or in reason, which would require a medical examiner, after he had been assured that the applicant had never had cancer, to explore every region of his anatomy to ascertain whether he was afflicted with it or any of the other thousand ills that human flesh is heir to.

The proposition that knowledge of a disease may be imputed to the physician and through him to the company, by reason of his negligence in making the examination, is opposed by every authority that I have had access to.

In a Georgia case, *Interstate Co. v. Bess,* 35 Ga. App., 723, 134 S. E., 804, 805, the Court said:

"In a case like the present, if the agent had actual knowledge of the facts which by a stipulation in the contract would render it void, the insurer could not set up such facts as a defense. But, before the knowledge of the agent could work a waiver on the part of his principal, the knowledge must have been actual. Constructive knowledge would not be sufficient for that purpose."

In the case of *Jeffords v. Ins. Co.,* 123 S. C., 467, 117 S. E., 79, 80, the Court said:

"The nonexistence of a mortgage upon the car was a statement of a fact by the plaintiff, a part of the conditions in the policy and of the warranty upon which the company acted in issuing the policy. The plaintiff bound himself to the truth of that statement, and agreed that, if it was not true, the policy should be canceled. There was no duty incumbent upon the defendant to do otherwise than act upon that statement; no duty arose to doubt it and verify it by any independent inquiry whatever."

The Court cites 14 R. C. L., 1172, where it is said:

"In general it may be said that the knowledge of an insurer which will form the basis for a waiver must be *actual notice* either to the insurer or its authorized agent, and not mere *constructive notice.* Accordingly a notice deposited in the mail is ineffective unless received and *the constructive notice imparted by the record of instruments is insufficient.*" (Italics by the Court.)

See, also, quite a list of authorities cited in the *Jeffords case* to sustain the proposition.