14281

NIX v. SOVEREIGN CAMP, W. O. W.

(185 S. E., 175)

April, 1935.

*Messrs. C. B. Earle* and *A. H. Dagnall,* for appellant,

*Messrs. Watkins & Prince,* for respondent, 

April 15, 1936.

, The opinion of the Court was delivered by MR. JUSTICE FISHBURNE.

The plaintiff-appellant is suing to recover the sum of $979.09, with interest, from the Sovereign Camp of the Woodmen of the World, as beneficiary of a certificate of insurance issued and delivered to her husband, John Nix, deceased, on March 20, 1934.

The respondent admits the issuance of the insurance policy, the death of the insured, and proof of death, but denies liability upon the ground of alleged breach of warranty on the part of the insured as to his health at the time of the delivery of the policy to him.

The case was tried before his Honor, Judge G. Duncan Bellinger, who, upon the conclusion of all the testimony, directed a verdict in favor of the defendant. He refused to direct a verdict for the plaintiff, and also overruled a motion for a new trial.

The plaintiff is appealing from these orders, upon exceptions which will now be considered.

The motion made by the defendant for a directed verdict was based upon the ground that the insured, in order to obtain the insurance, warranted that he was in sound health

at the time of the delivery of the policy, that the validity of the policy was conditioned, by the terms of the contract, on his being in sound health when the policy was delivered, and that the undisputed testimony showed that the insured at such time was not in sound health. Therefore there was a breach of the warranty which rendered the contract unenforceable; further, that he was in unsound health, knew that he was in unsound health, and that there was a false representation and a warranty which breached the contract.

By the constitution and by-laws of the insurer, which constitution and by-laws are likewise made a part of the contract, it is provided that the liability of the defendant for the payment of benefits shall not begin until the policy "is delivered to him (insured) in person while in good health." Likewise, in the conditions printed on the reverse side of the certificate and made a part thereof, there appears the provision that there shall be no liability until the insured has had "manually delivered into his hands, in person, this beneficiary certificate while in good health"; and it is therein provided that this and other provisions antecedent thereto and incorporated in the policy are conditions precedent to the payment of the benefits under this certificate. In an indorsement on the face of the policy, signed by the insured by his mark, when he received the policy, is this provision: "I have read the above certificate and accept the same, and warrant that I am now in good health, and have not been sick or injured since the date of my application." This indorsement bears date March 20, 1934, and in a separate paper styled "Applicant's Acceptance," which was signed by the insured by his mark on March 20, 1934, it is provided: "I have read the above certificate * * * and the conditions named therein, * * * and warrant that I am in good health at this time, and have not been sick or injured since the date of my application."

It is perfectly clear that the foregoing provisions constitute warranties, and so much is conceded by the appellant.

The legal effect of a warranty and the distinction between warranties and representations is clearly set forth in the opinion of this Court in *Kizer v. Woodmen of the World*, 177 S. C., 70, 180 S. E., 804, 807, where the Court says: "The difference between warranties and representations is often very vital. Construed as a warranty, the falsity of the statement amounts to an express breach of the contract, regardless of the good faith and honest purpose of the insured, and the statement does not have to be material, it has been held in some cases; construed as a representation, the falsity of the statement may render the contract voidable when it is shown to have been material to the risk and knowingly made. A representation is usually made in proposing a contract; a warranty is made when it 'is a part of the completed contract, either expressly inserted therein, or appearing therein by express reference to statements expressly made a part thereof.' 3 Joyce, Ins. (2d Ed.), No. 1882, and cases cited thereunder."

We think the major question involved in this appeal is: Was there evidence which should have been submitted to the jury on the issue that there was a breach of the warranty of good health at the time of the delivery of the policy?

John Nix, the insured, was a farmer, 53 years of age, living about five miles from Pendleton, in Anderson County. The testimony shows that he was illiterate—being unable to read or write. He signed an application for this insurance on February 21, 1934, upon the pressing and persuasive solicitation of Mr. A. P. Stone, who was the district deputy of the defendant, having supervision over Anderson, Pickens and Oconee Counties. Following the signing of the application, and some time in the early part of March, the insured was given a physical examination by Dr. D. J. Barton, the defendant's medical examiner, of Anderson, as a result of which he was recommended as being all right. The policy was delivered to the insured on March 20th by Mr. Stone, who testified that he again was forced to use the

most persuasive argument he could command in order to overcome the unwillingness of the insured to accept the policy. He also stated that on that day the insured appeared to be in good health.

The defendant offered the following testimony, tending to prove that the insured was not in sound health on March 20, 1934:

Dr. C. C. Horton, a practicing physician residing at Pendleton, who had known the plaintiff about 18 years, testified that he was called to the home of the insured one night during the year 1932 and found him suffering apparently with an attack of angina pectoris; that he had pains through the heart, due to the failure of the heart muscles to perform their functions, and he expressed it as his opinion that the insured never recovered from that organic heart disease; and further stated that, if a person dies without a physician present to assist or observe him, with what people generally call acute indigestion, and if he prior thereto has had organic heart trouble, like angina pectoris, the death must be ascribed to this disease, and not to acute indigestion. This witness told the insured at this time that the insured had a "heart attack, or something similar to that." Doctor Horton also said that excessive exercise and a heavy meal would probably predispose to such an attack.

Dr. W. E. Bickley, a practicing physician, living at Pendleton, stated that he had known the insured about 10 years, and attended him professionally on July 14, 1933; that in his opinion he then had a mild asthmatic attack, shortness of breath, wheezing, but not so very much pain. The next time this witness saw him professionally was on March 14, 1934, at which time the insured called at his office at Pendleton. The examination he then made was subsequent to that made by Dr. Barton, the company physician, and was two days' prior to the issuance of the policy, and six days before its delivery. Dr. Bickley then made a diagnosis of chronic myocarditis, which he described as being a weakening or degenera-

tion of the heart muscles—the heart muscles, or the heart itself. He stated that myocarditis is a serious heart disease, which generally does not kill immediately; and further said that he did not cure him of this heart trouble and doubted if it were curable. Dr. Bickley further testified that without a history, just a physical examination, if a man who is being examined did not tell a doctor who was examining him about the history of his attacks, he did not think the examining physician could every time, by a mere examination of the heart, determine whether the patient had angina, if he had no attack at the time, that angina comes on gradually, and that he knew that the insured's heart had been in this weakened condition since March 14, 1934, but that anginous attacks do not necessarily follow myocarditis. He did not tell the insured that he had an anginous heart.

Dr. Bickley saw the insured again professionally on April 6th, at the home of the insured, while he was actually in an attack of angina. At that time the insured was gasping for breath and suffering agonizing pains in his chest. He admitted upon cross examination that he did not pronounce the disease as being angina until April 6, 1934, but stated that conditions which bring about angina developed prior to the first attack.

Dr. A. D. Cloud testified for the defendant, by deposition, as follows:

"If a man about fifty-two years of age was examined by a physician on or about the year 1933 and found to be suffering from asthma at that time and he was examined again by a physician on or about March 13, 1934, and April 6, 1934, and again found to be suffering from chronic myocarditis and angina pectoris, and if he died on May 9, 1934, of so-called acute indigestion; and if he had been treated in the year 1933 by a physician who had examined him and found that he was suffering from asthma. could he, in your opinion as a physician, have been in good health on February 21, 1934, or on March 20, 1934? A. In my opin-

ion he could not have been in good health on either of the dates mentioned."

There was introduced on behalf of the plaintiff, as a part of the proof of death, a certificate signed by Dr. D. J. Barton, who is the same physician who examined the insured and recommended him for insurance. He was not present when the insured died, but reached his home very soon thereafter. In this certificate he states that he examined the insured in March, 1934, and found him all right; he stated, from investigation and from an examination of his dead body, that acute indigestion was the cause of death. It further appears from this certificate that Dr. Barton had no knowledge that the insured had ever been attended by any other physician.

Various friends and neighbors testified that the insured worked daily on his farm, in manual tasks, and appeared to be in good health up to the time of his death. The insured died suddenly, at night, after cutting grain with a cradle all day, followed by a hearty supper. All of the witnesses, without exception, testified that the insured was an honest, hard-working man, and bore a good reputation. He died on May 19, 1934.

"The term 'good health' when used in a policy of life insurance, means that the applicant has no grave, important, or serious disease, and is free from ailment that seriously affects the general soundness and healthfulness of the system."

This statement of the rule is quoted with approval in *Cooley v. Metropolitan Life Insurance Company,* 153 S. C., 280, 150 S. E., 793, 796. And in the same case the following quotation is given and adopted from 37 C. J., 404: "The actual and not merely the apparent health of the applicant is controlling in determining whether he was in good health when the first premium was paid or tendered."

The authorities uniformly hold that a statement by a person applying for life insurance that he is in "good health"

or "sound health" does not mean that he is in a condition of perfect health. If such were its meaning, there is no policy conditioned upon a statement of good health that would be valid, since no one, no matter how robust he may appear, is in perfect health. There is no one in whom there are not some seeds of disease. As was said by Lord Mansfield, in *Willis v. Poole,* Park on Insurance (2d Am. Ed.), 440: "We are all born with the seeds of mortality in us." Evidently the whole structure of life insurance rests on this assumption, since, if death was not in all cases a probable contingency, life insurance would not, and could not, exist.

In the old case of *Watson v. Mainwaring,* 4 Taunt., 763, under a policy containing a warranty of good health, with undisclosed dyspepsia as ground of avoidance, Judge Chambre said: "All disorders have more or less a tendency to shorten life, even the most trifling; as, for instance, corns may end in mortification. That is not the meaning of the clause. If dyspepsia were a disorder that tended to shorten life, within this exception (good health) the lives of half of the members of the profession of the law would be uninsurable."

This latter observation by the learned Judge is reminiscent of that early day in our own juridical history when lawyers, and Judges too, traveled from courthouse town to courthouse town upon horseback, and were forced to put up with all kinds of accommodations at inns and taverns, including indigestible food. (The good old days?)

It was held in *Welch et ux. v. Life Insurance Company of Virginia,* 124 S. C., 492, 117 S. E., 720, that the fact of being in good health at the time of delivery of the policy was a condition precedent to the effectiveness of the policy, and that the ignorance of the insured of the fact that he is not in good health could not possibly alter the fact of unsound health. There is obviously a close line between disease in its incipiency and merely a bodily condition which is susceptible to the contraction of the dis-

ease. A weak person may be well, and a strong person may be sick. And of course a person may have a diseased condition without knowing it.

The respondent contends that, whether the insured knew or appreciated the fact of his unsound health or not, there was an unbroken connection definitely and clearly shown between the diseased condition of his heart in 1932 and the angina pectoris, one running into the other, the effect of which caused death, and that it was impossible that the insured was in good health when the policy was delivered to him on March 20, 1934.

The Circuit Judge, after careful consideration, adopted this view, and directed a verdict for the defendant, but we think that he overlooked the force and effect of the testimony given by Dr. Barton, the examining physician for the defendant, and the testimony of other witnesses, on the question of good health.

The principle is well established in this State that an examination of the insured by a physician chosen by the insurance company is some evidence of one or two things: Either that the alleged disease did not exist or that its existence was known to and waived by the insurer. *Baker v. Metropolitan Life Insurance Co.,* 106 S. C., 419, 421, 91 S. E., 324; *Galphin v. Pioneer Life Insurance Co.,* 157 S. C., 469, 470, 154 S. E., 855; *McLaurin v. Mutual Life Insurance Co.,* 115 S. C., 59, 104 S. E., 327; *Crumel v. Metropolitan Life Insurance Co.* (S. C.), 184 S. E., 169; *Wingo v. New York Life Insurance Co.,* 155 S. C., 206, 101 S. E., 653; *McLane v. Metropolitan Life Insurance Co.,* 154 S. C., 366, 151 S. E., 608; *Gamble v. Metropolitan Life Insurance Co.,* 95 S. C., 196, 78 S. E., 875.

The testimony of Dr. Horton that the insured was apparently suffering an attack of angina pectoris in 1932, nearly two years before the issuance of the policy, and prior to the examination made by Dr. Barton, is not necessarily conclusive. And the same thing is true with reference to the

diagnosis made by Dr. Bickley in July, 1933. When Dr. Barton declared him a fit subject for life insurance in March, 1934, this, under the authorities, was some evidence tending to show either that the alleged disease did not exist at that time or else that its existence was known to and waived by the defendant.

The defendant lays much stress upon the fact that Dr. Bickley examined the insured on March 14, 1934, and made a diagnosis of chronic myocarditis, but the doctor testifies that he did not discover angina until April 6, 1934, after the delivery of the policy. It is to be observed that this testimony is again followed by that of Dr. Barton, who certifies on the death claim that the cause of death was acute indigestion, and that he reached this conclusion not only from investigation but also from an examination of the dead body.

Upon a careful review of the entire record, we cannot say as a matter of law that there was a breach of the warranty. The evidence is susceptible of more than one reasonable inference, and the issues in the case should be submitted to the jury.

It is the judgment of this Court that the judgment of the Circuit Court is reversed, and that the case be remanded for a new trial.

MR. CHIEF JUSTICE STABLER and MESSRS. JUSTICES CARTER, BONHAM and BAKER concur.