14481

CROCKER v. LIFE INS. CO. OF VIRGINIA

(191 S. E., 312)

No-vember, 1936.

*Messrs. Osborne, Butler & Moore,* for appellant,

*Messrs. J. Wright Nash* and *Johnson & Johnson,* for respondent,

May 10, 1937.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

On September 23, 1935, the defendant company insured, without medical examination of the applicant, the life of one Ernest Crocker in the amount of $500.00, the plaintiff, his stepmother, being named as beneficiary. The contract contained the following provision: "This policy shall be void if, upon its date and delivery, the insured be not alive and in sound health." After the death of Crocker, which occurred on April 1, 1936, the company refused, upon demand of the beneficiary, to pay the face amount of the policy, but offered

to return the premiums which it had received. The plaintiff declined to accept such offer, and this action followed.

The company set up various defenses. It alleged, among other things, that the contract of insurance was void from its inception for the reason that Crocker, on September 23, 1935, was suffering from cancer of the lungs, which was the immediate cause of his death.

On trial of the case, after all the evidence was in, the defendant moved for a directed verdict in its favor, except for the return of the premiums, on the ground—renewed here by the one exception—that the only reasonable inference to be drawn from the testimony was that the insured was not in sound health at the time of the delivery of the policy, and that, therefore, under the terms of the contract, there could be no recovery by the beneficiary. The motion was refused and the jury found for the plaintiff $500.00 and interest. From judgment entered, this appeal is taken.

There is no contention here as to the law. Counsel agree that the liability of the company, if the insured was not in sound health at the time of the issuance of the policy, is limited to a return of the premiums paid. *Welch v. Life Ins. Co. of Virginia,* 124 S. C., 492, 117 S. E., 720; *Cooley v. Metropolitan Life Ins. Co.,* 153 S. C., 280, 150 S. E., 793, 796; *Nix v. Sovereign Camp, W. O. W.,* 180 S. C., 153, 185 S. E., 175.

In the *Cooley case,* the following was quoted with approval: "The actual and not merely the apparent health of the applicant is controlling in determining whether he was in good health when the first premium was paid or tendered." 37 C. J., 404. Also: "The term 'good health' when used in a policy of life insurance, means that the applicant has no grave, important, or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system." 3 Joyce Ins. (2d Ed.), § 2004.

In the case at bar, the plaintiff concedes that "if Ernest Croker was afflicted with cancer on September 23, 1935, he would obviously not have been in sound health at such time, and the respondent should not be permitted to recover in this action"; but contends that the testimony supports a fair inference that the insured did not have that disease on the date named. The appellant urges, however, that its motion was sound as applied to the evidence and that the trial Judge was in error in refusing to grant it.

Five doctors testified in the case, of whom Macnish, Battles, and Gibbons were examined by deposition in St. Louis, Mo., on behalf of the appellant. At the trial, the defendant also offered Dr. Finney as a witness, while Dr. Black testified for the plaintiff in reply. For a proper determination of the issue before us, it will be necessary to examine the testimony of these witnesses in so far as it relates to such issue.

Dr. Macnish stated that he had been connected with the St. Louis City Hospital for five years; that about January, 1935, he admitted Ernest Crocker there as a patient, and made a diagnosis of his trouble by instrumental examination and X-ray, which showed that there was a tumor on the left kidney, a condition technically known among physicians as carcinoma, but understood by laymen to be cancer; that this preliminary diagnosis was verified by an operation which he performed on the patient, and in which the kidney was removed. He further testified that Crocker was under his treatment after the operation about one month, but that he was observed for several months thereafter in the outpatient clinic, where he was "given deep X-ray treatment by Dr. Sante, Radiologist down there"; that he met him by chance in the X-ray room some time prior to September 1, 1935; and that, as the witness remembered him, he looked very little improved—appeared to be emaciated, had a bad color, and seemed quite weak; that he did not then attribute his emaciated appearance and bad color to the operation which he had performed upon him, "but looking back at the nature

of the disease I was very suspicious that the carcinoma had spread into other tissues," as "cancer of the kidney is a type of cancer particularly prone to spread to other organs, and one never knows after removal of the cancerous kidney, even though the removal seemed complete, whether further spread will take place." He also stated that it seemed, from the previous history of the case, that Crocker, in September, 1935, "began to show signs of the lung involvement from the secondary invasion of cancer tissue."

Dr. Battles testified that he saw Crocker on September 16, 1935, and examined his ears, nose, and throat; that he complained at the time "of choking and difficulty in breathing," but that the examination disclosed only "some reddening of his nose, throat, larynx, and trachea, which appeared to be due to upper respiratory infection"; and that he prescribed a cough mixture.

Dr. Gibbons stated that he admitted Crocker to the Veterans' Hospital, Jefferson Barracks, Mo., on March 16, 1936; that the "admission diagnosis of this patient was malignancy of the lung, probably secondary to hypernephroma. Patient gave me a history of removal of left kidney at the City Hospital at St. Louis, Missouri, approximately one year prior to admission. Diagnosis of hypernephroma was established at that time. About six weeks prior to the admission to the Veterans' Hospital patient developed soreness in the chest, especially in the left side," and that he learned this "through the patient's statement. X-rays with accompanying diagnosis of hypernephroma of the lung was established, which was verified by clinical symptoms and physical findings." He further testified that Crocker died at the hospital and that the "cause of death was carcinoma of the lung or hypernephroma secondary to hypernephroma of the left kidney"; and that "the secondary condition of the lung existed at the time of the operation for the removal of the kidney without a doubt, as the lung pathology is secondary to the kidney; and if the tumor was removed, as it was at the oper-

ation, the metastasis must have been or had to be there to be in the lung at the time of his death." The witness explained that "hypernephroma" is a form of carcinoma, and that "metastasis" is how the tumor spreads—"by way of the lymphatics and the blood stream." When asked what he thought was the extent of the development of the hypernephroma on September 16, 1935, assuming that Crocker at that time complained of choking and of difficulty in breathing, he said: "In view of the history of this case, the previous operation, the later picture that I saw at the time of his death, it is my opinion that at that time the patient was suffering from pulmonary embarrassment, meaning difficulty in breathing, dyspnea, shortness of breath, due to the growth of the tumor masses through the lungs."

Dr. Finney, who had never seen the insured, testified at some length as a medical expert. He stated, among other things, when asked if cancer of the lung and cancer of the kidney are regarded as related from a medical standpoint, that "you always connect the two, and ninety-nine times out of a hundred you are right." Based upon the history of the case as told to him, it was the opinion of Dr. Finney that the carcioma of the lungs, which caused the death of Crocker, was the result of metastasis from the cancer of the kidney.

To questions asked by the trial Judge, the witness responded as follows:

"The Court—Do you say that cancer of the lung following approximately a year from the operation for cancer of the kidney would necessarily develop from that, or could it be individual?

"Witness—It could be primary. It is purely statistical. When you have cancer of the kidney with the man dying one or even two years later with cancer of the lung, then you say to yourself: that man has metastasis from the kidney.

"The Court—Is it possible for it to have been cancer and develop independently?

"Witness—It is possible, and could have no relation whatever; that is a possibility that you would not suspect. You would be right in saying it came from the kidney nearly every time."

Dr. Black, who could not recall that he had ever seen the insured, also testified at length as a medical expert. When asked whether there was any way for Dr. Gibbons to ascertain the fact testified to by him, that "the secondary condition of the lung existed at the time of the operation for the removal of the kidney without a doubt, as the lung pathology is secondary to the kidney," replied: "I think he probably could have found out a great deal about it, for he would have him very thoroughly examined and X-rayed." He also stated, among other things, that the choking and difficulty of breathing complained of by Crocker on September 16, 1935, if he did so complain, only showed, as the witness thought, that the extent of the development of the hypernephroma at that time "was very minimum, if any," and that it was possible that the carcinoma was primarily in the lung. But he further testified:

"Q. It is entirely probable from a medical standpoint that this carcinoma of the lungs in this case which I have discussed was a result of the carinoma of the kidney metastasized? A. It is reasonable to think that.

"Q. And if you had nothing more on which to diagnose this case, would you diagnose that this was the result? A. I would be inclined to think so."

And also:

"Q. In other words, the man had a cancerous condition that he did not know about, but it was in the process of development? A. We might all be in that process right now.

"Q. I am not talking of what we may be. I am talking of the actual condition of his body. When he was operated on for cancer of the kidney and dies from carcinoma of the lung, in all probability the condition existed all that time? A. It is reasonable to think so.

"Q. And that would be your diagnosis? A. I would be inclined to think that way until I could see and study it.

"Q. In other words, the man on the ground and who sees the patient is in better position to say than a man like you and Dr. Finney? A. The only way would be to get a specimen from the lung. You could tell definitely. That is by postmortem examination.

"Q. That is your definite conclusion of the matter? A. Yes.

"Q. X-ray would be helpful? A. Yes.

"Q. And clinical findings and a physical examination? A. Yes.

"The Court—Would it necessarily follow that if a person had a cancerous condition of the kidney and was operated on in 1935, January, and in September, 1935, had a choking condition, difficulty of breathing, and so forth, and later died in April, 1936, with cancer, would it necessarily follow that he had a cancerous condition in September, 1935?

"Witness—It is possible that he had it—he could have cells without showing it at that time, and some of them are fatal within one or two months,—sometimes longer."

From the foregoing testimony, it is seen that Dr. Macnish and Dr. Gibbons, who had examined Crocker at different times between January, 1935, and April, 1936, were in a position to express the better opinion as to the cause of the insured's death; and their testimony is to the positive effect that the carcinoma of the lung, from which Crocker died, was secondary to the hypernephroma of the kidney. About this Dr. Gibbons was emphatic and sure. It is true that Dr. Finney and Dr. Black said that there was a possibility that the cancer of the lung was primary; but Dr. Finney also testified, as is seen, that such possibility would not be suspected, and that you would be right in saying it came from the kidney nearly every time; and Dr. Black thought it reasonable to conclude, from the facts stated, that the carcinoma of the

lung was a result of the hypernephroma of the kidney metastasized.

It is clear, therefore, that there was no evidence from which the jury could reasonably infer that the insured's lung trouble could have been primary. Expressions of opinion as to possibilities are nothing more, at best, than speculative and hypothetical views. We have read the record with painstaking care several times, and say without hesitation that the only reasonable inference to be drawn from the evidence is that Crocker was not in sound health, within the meaning of the quoted provision of the insurance contract, at the time of the delivery of the policy.

Certain lay witnesses testified that they saw the insured in September, 1935, and that he looked well, However, they did not and could not say that he was not afflicted with cancer at that time. On the contrary, as already indicated, there was medical testimony to the effect that the dread disease was then present. Furthermore, some of the evidence tends to show that one may appear to be in sound health and not be so.

The judgment of the Spartanburg County Court is reversed, and the case is remanded with instructions to enter judgment for the defendant under Rule 27 of this Court.

Messrs. Justices CARTER, BONHAM, BAKER and FISHBURNE concur.